WIESNER vs. ZAUN.

DEED: ESTOPPEL. *(1) Deed construed as purporting to convey the whole land, and giving color of title thereto. (2) Grantor's subsequent title enures to grantee by estoppel.*

STATUTE OF DESCENTS. *(3, 4) On death of minor child, surviving brothers and sisters take his share of his deceased parent's estate as heirs of the parent. (5, 6) Rule explained and limited.*

STATUTE OF LIMITATIONS. *(7, 8) Disability of coverture suspended the running of the statute before the act of 1872.*

1. J. G. A., after the death of his wife, Rosina A., being in possession of land

Wiesner vs. Zaun.

which had belonged to her, and entitled to the possession as tenant by the curtesy and as owner in fee of an undivided one-sixth thereof as heir-at-law of a deceased son, Henry A., conveyed the land by warranty deed to Z.; in the premises of which deed the grantor is described as "father of Henry A., deceased, and husband of Rosina A., deceased, and only heir-at-law of both." Then follow apt words to convey the whole land. *Held,* that the deed purports to convey the whole land, and not merely the interest which the grantor really had therein; and possession of the land under such deed by the grantee and those claiming under him was a possession under color of title adverse to the surviving children and heirs of Rosina A., and would ripen into a perfect title in ten years, under the statute of limitations. R. S., ch. 138, secs. 6, 7, 10.

2. The grantor in such deed having subsequently become entitled to another undivided sixth part of said land as heir-at-law to another child, deceased, said title, by virtue of the covenants in the deed, enured to the benefit of the grantee therein named, by way of estoppel.

3. After the death of said grantor, a third child of him and the said Rosina A. died, a minor and unmarried. *Held,* that the undivided one-sixth interest in the land, which said child inherited from the mother, descended to the three surviving children in equal shares (R. S., ch. 92, sec. 7; Tay. Stats., 1170, § 1, subd. 6); and said surviving children took as heirs of the mother, and not as heirs of the deceased child. *Perkins v. Simonds,* 28 Wis., 90, as to this point, reaffirmed and held applicable to the revision of 1858.

4. The undivided one-eighteenth which thus descended to plaintiff as one of the three surviving heirs of Rosina A., is held by plaintiff in the same manner, and subject to the same rules of law, as the one-sixth interest which accrued to her immediately upon the mother's death; and it may be recovered in this action if said one-sixth may be thus recovered, and not otherwise.

5. The rule that, upon the death of a minor child, the interest in land which he inherited from his mother descends to the surviving children, as heirs of the mother, and not as heirs of such deceased minor, is not intended to affirm that such surviving children will take the title unaffected by any conditions, as though such minor had never existed.

6. If the estate of such deceased minor had been sold under the statute for his maintenance or education, the purchaser might have acquired a perfect title, which would not be divested on the minor's death.

7. The "disability" which prevented the statute of limitations upon actions for the recovery of real property from running in cases of infancy, insanity, imprisonment and coverture, by the law of this state found as sec. 13, ch. 138, R. S. (but now repealed by ch. 44, Laws of 1872), did not necessarily mean an "incapacity to do a legal act," but related also to

the condition of a party subject to legal "duress," or to the control and protection of other persons; and such disability still existed in the case of a married woman (before the act of 1872), notwithstanding the statute concerning the "rights of married women" (Laws of 1850, ch. 44; Tay. Stats., 1195), which gave to a wife the absolute control of her separate estate the same as though she were unmarried, and notwithstanding sec. 15, ch. 122, R. S., which permitted her to sue alone in respect to such estate.

8. If plaintiff had been an unmarried woman at the time of the death of tenant by the curtesy, in 1857, she being then of age, and the defendant or his grantor being in actual adverse possession of the whole land under the deed above described, her rights would have been barred by the statute in 1867. But she being then and ever since a married woman, the statute did not commence to run against her until ch. 44, Laws of 1872, took effect.

APPEAL from the Circuit Court for *Washington* County.

The action was brought to recover an undivided interest in certain lands situated in Washington county, and was tried by the court without a jury. The case, as it appears from the pleadings, evidence and findings of fact by the court, is as follows:

The land in which the plaintiff claims such interest was purchased from the United States by one Ebenezer Jones, and, in the year 1846 was conveyed to Rosina Ahnert, the wife of Johann Gottlieb Ahnert. This conveyance names "Ebenezer Jones and Abigail Jones, his wife," as the grantors, but was not executed by the wife.

In 1847, Rosina Ahnert died intestate seized of such land, leaving surviving her said Johann Gottlieb, her husband, and six infant children of their marriage, to-wit: Henry, aged nineteen; August, aged seventeen; *Karolina* (the plaintiff), aged fifteen; Karl, aged thirteen; Ernst, aged eleven; and Franz, aged eight years.

In 1849, Henry, the eldest son, died without issue, unmarried and intestate. At the time of his death he was the owner of an undivided one-sixth of said land, which he

inherited from his mother; and, it is assumed, he was then over twenty-one years of age.

In 1851, Johann Gottlieb Ahnert, being in possession of the land, and entitled to such possession as tenant by the curtesy, and as the owner in fee of an undivided one-sixth part thereof as heir-at-law of his son Henry, conveyed the same to Philip Andreas Zaun, the grantor of the defendant. Such conveyance commences as follows: "This indenture, made this seventh day of June, 1851, between Johann Gottlieb. Ahnert, father of Henry Ahnert, deceased, and husband of Rosina Ahnert, deceased; and only heir-at-law of both, party of the first part, and Philip Andreas Zaun, party of the second part, Witnesseth:" Then follow apt and proper words to convey the whole tract of land of which the plaintiff claims an undivided part, with the usual covenants of seisin, against incumbrances, for quiet enjoyment, and of warranty. Afterwards, and during the same year, Abigail Jones, the wife of the former owner of the land, executed to Philip Andreas Zaun a quitclaim deed thereof, which was doubtless intended as a release of her inchoate right of dower in the land. Zaun forthwith entered into possession of the land, upon the execution of the conveyance thereof to him by Ahnert, and resided thereon with the defendant (his son) from that time until he conveyed the same land to the defendant as hereinafter mentioned.

In 1855, August Ahnert, then being of full age and the owner of an undivided one-sixth of said land as heir-at-law of his mother, died intestate, without issue, and unmarried.

In 1857, Johann Gottlieb Ahnert also died intestate.

In 1860, Franz Ahnert died, being then under the age of twenty-one years, unmarried, and without issue.

In 1861, Philip Andreas Zaun, by deed containing full covenants of warranty, conveyed to the defendant the whole of the land described in Ahnert's deed to him, and immediately

removed therefrom, leaving the defendant in full possession thereof. The defendant has been in the actual possession and occupancy of said land ever since the execution of such conveyance. During the whole time of his occupancy, Philip Andreas Zaun claimed title to the whole of the land described in Ahnert's conveyance to him, exclusive of any other right, founding his claim on such conveyance; and the defendant, in like manner, claimed title thereto, founding his claim on the same conveyance and on the deed thereof from Philip Andreas to himself.

In August, 1873, Ernst Ahnert also died intestate, without issue, and unmarried. He was then about thirty-seven years of age.

In 1851, the plaintiff intermarried with one Frederick Wiesner, who is still living, and she is still his wife. Karl Ahnert is also living.

This action was commenced in November, 1873.

The conclusions of law filed by the circuit judge are as follows:

" 1. That the said children of said Rosina Ahnert, on their mother's death, were each vested with an undivided one-sixth of the land by inheritance so as aforesaid owned by her at her decease, subject to the tenancy by the curtesy of said Johann Gottlieb Ahnert.

" 2. That on the death of Henry Ahnert, his interest or share descended to his father, Johann Gottlieb Ahnert.

" 3. That on the decease of August Ahnert, in 1855, his share of the lands described in said deed of 1851, by virtue of the covenants of warranty therein and the estoppel resulting therefrom, descended to and became the property of Philip Andreas Zaun, the grantee of his father, Johann Gottlieb Ahnert.

" 4. On the death of Franz Ahnert, in 1860, his share in said lands last described, descended to his surviving brothers and sister.

Wiesner vs. Zaun.

" 5. At the death of Ernst, in 1873, his interest or share in said land had become cut off by operation of the statute of limitations, which had run against him and in favor of the defendant herein, who had been in possession under said deed of 1861, in good faith, as hereinbefore found, and for more than ten years after said Ernst had become twenty-one years of age.

" 6. That said plaintiff is under the disability of coverture, and not as yet affected by the operation of said statute of limitations in favor of said defendant.

" 7. That said plaintiff is entitled to recover possession from the defendant of her share aforesaid, to wit, four-eighteenths of [said land], which is unlawfully withheld by said defendant, together with six cents damages.

" 8. That the plaintiff is entitled to recover no greater or other interest in said land than as last above specified.

" 9. That judgment be entered that the plaintiff do recover possession of said defendant of her four-eighteenths of said land as aforesaid, with said damages and costs."

Judgment was entered accordingly; from which the defendant appealed.*

---

*The territorial statutes of Wisconsin, as revised in 1839, contained the following provisions (p. 260) as part of " An act concerning the time of commencing actions:" § 13. "If any person entitled to commence any action in this act specified, or to make any entry, avowry or cognizance, be at the time such title shall first descend or accrue, either (1) Within the age of twenty-one years; or, (2) Insane; or, (3) Imprisoned on any criminal charge, or in execution upon some conviction of a criminal offense for any term less than for life; or (4) A married woman, the time during which such disability shall continue, shall not be deemed any portion of the time in this act limited for the commencement of such suit, or the making such entry, avowry or cognizance. But such person may bring such action or make such entry, avowry or cognizance after the said time so limited, and within ten years after such disability is removed, but not after that period." § 14. " If the person entitled to commence such action, or to make such entry, avowry or cognizance, shall die during the continuance of any disability specified in the preceding section, and no de-

The cause was first argued at the June term, 1874.

*Butler & Winkler,* for the appellant:

1. The defendant and his grantor held adverse possession under color of title, from 1851 to the commencement of the action. *Sydnor v. Palmer,* 29 Wis., 250; *Stevens v. Brooks,* 24 id., 326; *Edgerton v. Bird,* 6 id., 527. 2. The statute of limitations began to run against the heirs of Rosina Ahnert upon the death of her husband, who was tenant by the curtesy. *Doe v. Gregory,* 2 Ad. & El., 14; *Jackson v. Harsen,* 7 Cow., 323; *Jackson v. Schoonmaker,* 4 Johns., 390; *Miller v. Ewing,* 6 Cush., 34; *Gernet v. Lynn,* 31 Pa. St., 94; 3 Wash. R. P., 132, § 30; Tyler on Eject., 117, 118. 3. Assuming the plaintiff to have been under constant disability, can she recover the one-eighteenth to which she became entitled on the death of her brother Franz? It is claimed for the plaintiff, that as she was under disability

---

termination or judgment be had of the title, right or action to him accrued, his heirs may commence such action, or make such entry, avowry or cognizance, after the time in this act limited for that purpose, and within ten years after his death, but not after that period." §§ 12 and 13, ch. 127, R. S. 1849 ("Of the limitation of actions "), are in the same language as those above quoted, substituting "chapter" for "act." The corresponding provisions in the R. S. of 1858 are found in sec. 13, ch. 138, which is as follows: "If a person entitled to commence any action for the recovery of real property, or to make an entry or defense founded on the title to real property, or to rents or services out of the same, be, at the time such title shall first descend or accrue, either (1) Within the age of twenty-one years; or, (2) Insane; or, (3) Imprisoned on a criminal charge, or in execution upon conviction of a criminal offense, for a term less than for life; or, (4) A married woman, the time during which such disability shall continue shall not be deemed any portion of the time in this chapter limited for the commencement of such action, or the making of such entry or defense; but such action may be commenced or entry or defense made, after the time limited, and within five years after the disability shall cease, or after the death of the person entitled, who shall die under such disability; but such action shall not be commenced, or entry or defense made, after that period."

The revision of 1839 (pp. 184, 185) contained the following provision: § 38. "When any person shall die seized of lands, tenements or hereditaments not

when this interest accrued, the time of such disability is excluded, without regard to the adverse possession before the title came to her, it not being then barred. Such a doctrine might suspend the operation of the statute through generations, if not forever; since a title may be continually held by parties under disability. We have always supposed the law to be, that cumulative disabilities are of no avail, and that the disability of the party to whom an estate or title adversely possessed *first* descends, is the only one for which an allowance is made, whether the action be brought by that party himself or by his heirs. The principle of the statute of limitations is, that the action must be brought within the time limited from the time *when the right of action accrued;* and it is extended only by a disability which then intervenes. *Henry v. Carson*, 59 Pa. St., 296; Angell on Lim. (5th ed.),

---

by him devised, the same shall descend in equal shares to and among his children and such as legally represent them (if any of them be dead), and in every case where children shall inherit by representation, it shall be in equal shares; and where there are no children of the intestate, the inheritance shall descend equally to the next of kin in equal degree, and those who represent them, computing by the rules of the civil law." * * § 39. "When any of the children of the intestate dies before his arrival at the age of twenty-one years, and unmarried, such deceased child's share shall descend equally among the surviving brothers and sisters, and such as legally represent them; but if such deceased child die after having arrived at the age of twenty-one years, unmarried and intestate, in the lifetime of the mother, every brother and sister shall inherit equally with the mother." Sec. 1, ch. 63, R. S. 1849 ("Of title to real property by descent "), contained the following provisions in subds. 5 and 6: "5. If the intestate shall leave no issue, nor widow, and no father, mother, brother or sister, his estate shall descend to his next of kin in equal degree [with an exception not important here]: *Provided*, however, 6. If any person shall die leaving several children, or leaving one child and issue of one or more other children, and any such surviving child shall die under age and not having been married, all the estate that came to the deceased child by inheritance from such deceased parent, shall descend in equal shares to the other children of the same parent, and to the issue of any such other children who shall have died, by right of representation."

Subds. 6 and 7 of sec. 1, ch. 92, R. S. 1858, are in the same terms.

ch. 36, §§ 477 and notes, 479, 480, and cases there cited. The case falls within the direct terms of our statute. Franz Ahnert died in 1860, under age. He was "*the person entitled dying under disability.*" The extension of the ordinary period of limitation by this disability clause must, in this case, fall within five years after his death. Angell on Lim., § 480. 4. When plaintiff's title to *one-sixth* of the land accrued, upon the death of her father in 1857, she was a married woman; but her marriage was not a disability which gave her immunity from the statute of limitations. Sec. 12, ch. 127, R. S. of 1849, did not attempt to create disabilities, but enumerates certain classes of persons then under actual, well known legal restrictions and incapacities, and suspends the statute of limitations in their behalf. Among these are mentioned married women, because they were then under an actual disability. At the common law the wife " was not only incapable of conveying her real estate by deed, but could not, as a general rule, make a valid contract of any description in relation either to real or personal property." " Her acts were not, like those of infants and some other *disabled persons,* voidable only, but, in general, absolutely void." She could not employ an attorney; she could not sue. Tyler on Inf. & Cov., 311–320; 1 Parsons on Con., 339. But shortly after the R. S. of 1849 took effect, the disability, the legal incapacity, of the married woman, as it then existed, was absolutely swept away, so far as her separate estate was concerned, by ch. 44, Laws of 1850. This statute gave her the right to sue alone. *Norval v. Rice,* 2 Wis., 30; *Botkin v. Earl,* 6 id., 393; *Conway v. Smith,* 13 id., 125–136. " With respect to her separate property, the statute has placed her upon the same footing as to all the world, her husband included, as if she were, in the words of the statute, ' a single female. ' " 29 Wis., 140. When, therefore, the plaintiff's title to the one-sixth now in question accrued, she could assert and exercise her rights of ownership to the same extent as any of her

adult brothers. It seems to us clear, as an original proposition, that the act of 1850 terminated the disability referred to in the statute of limitations, so far as the recovery of her separate estate is concerned. Counsel cited in support of this view, *Slater v. Cave,* 3 Ohio St., 80; *Brown v. Cousens,* 51 Me., 301; *Ball v. Bullard,* 52 Barb., 141; *Thompson v. Cragg,* 24 Tex., 583; *Ong v. Sumner,* 1 Cinc. Sup. Ct. R., 424; and criticised *Bauman v. Grubbs,* 26 Ind., 419; and *Burke v. Beveridge,* 15 Minn., 205. They further contended that, as plaintiff's title accrued in 1857, the question of disability in this case is not embarrassed by the reënactment of the married woman's act and the old disability clause, at the same time, in the R. S. of 1858. If the plaintiff was under no disability when her right accrued, then no disability created by the statutes of 1858 can avail her. Sec. 34, ch. 134, R. S. 1858. The terms of sec. 13 of the latter act are also in the future tense. Counsel further contended that the disability clause in the statute of limitations, as found in the revision of 1858, should be construed as referring solely to causes of action in favor of married women as to which their disabilities were not removed by the act of 1850; as for a personal injury suffered through the negligence of another, or for property received from the husband. *Pike v. Miles,* 23 Wis., 164. 5. Zaun's purchase and occupancy under claim of title can not be impugned for bad faith upon any facts appearing in this case. *Rawson v. Fox,* 6 Ch. Leg. News, 278. In determining the question of good faith in such cases, the maxim that all persons are presumed to know the law, has no application. Otherwise the multitude of cases (such as *Edgerton v. Bird,* 6 Wis., 527) where deeds void on their face have been held to confer color of title, have been wrongly decided. *Livingston v. Peru Iron Co.,* 9 Wend., 511, arose under the champerty act, and presented a case of actual *fraud.* Yet it is held that the doctrine of that case, even, is not applicable to adverse possession under the statute of limitations. *Humbert*

*v. Trinity Church*, 24 Wend., 587, 610, 632, 634; *Crary v. Goodman*, 22 N. Y., 170, 177; Tyler on Eject., 863-5.

*Mariner, Smith & Ordway* and *Frisby & Weil*, for the respondent: .

1. Coverture furnished in this state a perfect answer to the statute of limitations (Terr. Stat. of 1839, p. 260; R. S. 1849, ch. 127, sec. 12; and R. S. 1858, ch. 138, sec. 13), until the elimination of the coverture clause by ch. 29, Laws of 1872. The Married Woman's Act of 1850 did not repeal this clause by implication. Such repeals are not favored in the law, and are recognized only in cases of necessity. Potter's Dwarris, 113, note 9, and 154; *White v. Johnson*, 23 Miss., 68; *Mc-Cool v. Smith*, 1 Black, 459; *Wood v. U. S.*, 16 Pet., 342; *Brown v. Comm'rs*, 21 Pa. St., 37; *Bowen v. Lease*, 5 Hill, 221; *Williams v. Potter*, 2 Barb., 316; *Att'y Gen. v. Brown*, 1 Wis., 513; *Goodrich v. Milwaukee*, 24 id., 422. The *disability* referred to by the statute is not merely an inability to sue; for an infant also may sue by next friend or guardian. Bingham on Inf., 117, 118, and note; Angell on Lim., § 195. The disabilities of infants result from the precautions of the law to guard them against their own inexperience. As to coverture, the sole authority is in the husband, and the wife must obey, and all her disabilities remain except so far as necessary to carry out the statute as to the care and use of her separate property. *Peck v. Ward*, 18 Pa. St., 506; *Mahon v. Gormley*, 24 id., 80; *Wooster v. Northrup*, 5 Wis., 245; Cord's Married Women, §§ 974 et seq. The statute in each case is to run until the disability is removed; and this must mean *all* the disabilities of the state of marriage, infancy, etc. *Burke v. Beveridge*, 15 Minn., 205; *Bauman v. Grubbs*, 26 Ind., 419; *Dunham v. Sage*, 52 N. Y., 229. The doctrine contended for by the defendant would bar the special right of redemption vested in a married woman in the case of tax sales, a right which this court has repeatedly recognized. *Wright v. Wing*, 18 Wis., 50, 51; *Woodbury v. Shackleford*,

19 id., 60, 61; *Deery v. McClintock*, 31 id., 204. (Counsel also criticised and distinguished the cases of *Ong v. Sumner*, 1 Cin. Sup. Ct. R., 424; *Brown v. Cousens*, 51 Me., 301; and *Slater v. Cave*, 3 Ohio St., 80.) A statute ought to be so construed that, if possible, no clause, sentence or word shall be superfluous, void or insignificant (*Harrington v. Smith*, 28 Wis., 43); and statutes of limitation are to be strictly construed. Angell on Lim., §§ 485–6; *Demarest v. Wynkoop*, 3 Johns. Ch., 146. Where there is no ambiguity in the language of the statute, courts cannot correct supposed defects. *Benton v. Wickwyre*, 9 Alb. L. J., 309; Dwarris, 721; *Buffham v. Racine*, 26 Wis., 449, and cases there cited. In construing positive statutory enactments, the maxim, "the reason of the law ceasing, the law itself ceases," is inapplicable. *Ellis v. Griffith*, 16 M. & W., 109. The language of the disability clause, including the case of a married woman, is perfectly plain; and if its enforcement would work injustice, which we deny, the cure must be with the legislature. *Rosenplanter v. Rœrsle*, 54 N. Y., 262. 2. Plaintiff had no right of entry until the death of the tenant by the curtesy; and until that time the possession of defendant's grantor was not adverse (Angell on Lim., §§ 369, 371–2 and p. 422; 2 Washb. R. P., 2nd ed., 475, 505; *Sands v. Hughes*, 53 N. Y., 294); and no act or declaration of his could make the possession adverse so as to set the statute running. *Strœbe v. Fehl*, 22 Wis., 343; *Jones v. Billstein*, 28 id., 221, 225–6; *Merriman v. Caldwell*, 8 B. Mon., 33; *Salmon's Adm'rs v. Davis*, 29 Mo., 176; *Melvin v. Proprietors, etc.*, 16 Pick., 137; *S. C.*, 17 id., 255; *Raymond v. Holden*, 2 Cush., 269; *Gernet v. Lyon*, 31 Pa. St., 94; *Jackson v. Schoonmaker*, 4 Johns., 402. 3. The ten-year limitation (R. S., ch. 138, secs. 6, 10) did not begin to run on the death of the tenant by the curtesy, in 1857. (1) No *entry* was then made under the deed of 1851. Such entry had already been made in 1851; and there could be but one entry under that deed, and

one possession. (2) The entry made by defendant's father in 1851 cannot be treated as made "under claim of title, *exclusive of any other right.*" The deed to him on its face conveyed only the grantor's interest as heir of his son Henry and as tenant by the curtesy. The covenants of warranty are no part of the conveyance. They only refer to the estate conveyed; and, the deed not professing to pass any greater estate than that above described, they cannot operate as color of title to any greater estate. *McRae v. Williams,* 7 Jones' Law (N. C.), 430; *Crary v. Goodman,* 22 N. Y., 170; *McEvoy v. Loyd,* 31 Wis., 146. The recitals of the deed fix the intention of the parties. 3 Washb. R. P., 368. The description of the grantor as heir of Rosina Ahnert, deceased, is indeed unusual as applied to a tenant by the curtesy; but it might well be embraced in the general definition of the word "heir," as the person who takes an estate in lands or tenements by descent from another, as distinguished from an alienee or a devisee. 2 Burr. Law Dic., 565. It certainly carries the information that the grantor acquired his estate without deed or will; and the interest so derived from his wife could only be that of a tenant by the curtesy. These recitals operated as notice to the grantee of the character of his grantor's title. *Parker v. Kane,* 4 Wis., 1; *Lamont v. Stimson,* 5 id., 443; *Fallass v. Pierce,* 30 id., 468-9; *Quinlan v. Pierce,* 34 id., 304; *Goodenough v. Spencer,* 46 How., 353; *Williamson v. Brown,* 15 N. Y., 358-362; *Baker v. Bliss,* 39 id., 70; *Read v. Gannon,* 50 id., 345-350; *Reeder v. Barr,* 4 Ohio, 459; 2 Washb. R. P. (2nd ed.), 685. The deed conveying on its face only the one-sixth interest of the grantor as heir of Henry and his life estate as tenant by the curtesy, there could be under it no *bona fide* claim of a greater estate. Angell on Lim., § 401, note 6, and § 408; *McEvoy v. Loyd, supra; Thompson v. Cragg,* 24 Tex., 582; *Doe v. Roe,* 25 Ga., 178. (Counsel further argued from the answer and the evidence that defendant's grantor took his deed with notice of the

nature of his grantor's title.) The claim of title in such cases must be made in good faith. *Whitney v. Powell*, 1 Chand., 52; *Woodward v. McReynolds*, id., 250; *Edgerton v. Bird*, 6 Wis., 536; *Livingston v. Iron Co.*, 9 Wend., 513, 517–18; *La Frombois v. Jackson*, 8 Cow., 595, 602; *Clapp v. Bromagham*, 9 id., 531, 557; 15 Barb., 490–91; 19 Vt., 164; *Watson v. Greggs*, 10 Watts, 296; *Bradstreet v. Huntington*, 5 Pet., 409; 25 Ga., 178; Angell on Lim., §§ 37, 404–5; Tyler on Eject., 871. 4. The deed of the tenant by the curtesy, whatever its form, conveyed in fact only an estate for his life. R. S., ch. 83, § 32, and ch. 86, § 4. On his death the estate ended absolutely, and there could be no holding over or tenancy by sufferance; and the act of his grantee in retaining possession was that of a stranger intruding. Angell on Lim., §§ 331, 444; *Doe v. Prosser*, 1 Cowp., 217; *Jackson v. Harsen*, 7 Cow., 327; *Clapp v. Bromagham*, 9 id., 554; *Constantine v. Van Winkle*, 6 Hill, 194, and note; *Sands v. Hughes*, 53 N. Y., 294; *Miller v. Shackleford*, 3 Dana, 289. Philip Zaun's possession and cultivation of the land, from that time, to the exclusion of the plaintiff and other heirs, and his claim to own the whole, was a disseisin of the true owners, and adverse to the whole world. *Jones v. Reeves*, 6 Rich. Law, 132; *Brown v. Spand*, 2 Mill (S. C.), 11; *Livingston v. Peru Iron Co.*, 9 Wend., 517; 9 Cow., 554. The answer also admits that such holding by Philip Zaun was adverse. The twenty-year limitation, therefore, began in 1857 to run in favor of Philip Zaun and any person claiming under him. 5. There was no change of the possession by virtue of the deed from Philip Zaun to the defendant in 1861, such as would set the ten-year limitation running in defendant's favor from that time. (1) There was in fact *no change* of place or position on defendant's part. He had resided with his father since 1851, doing most of the work on the same land. He resided there after his marriage, and his father did not remove from the land until *after* the deed to defendant. The latter was performing the same acts

of ownership before as after the date of his deed. (2) He who takes by grant from one already in possession (especially if sharing that possession with him), will be regarded as continuing under the same title. *Finlay v. Cook*, 54 Barb., 9; Angell on Lim., § 442. There can be but one adverse possession, and that must be continuous, no matter how often it may be assigned or transferred from one person to another. *Merriam v. Caldwell*, 8 B. Mon., 33. If defendant's grantor had held adversely for nineteen years before conveying the land, defendant, continuing in possession one year thereafter, could have claimed the benefit of the twenty years of adverse possession. *Chadbourne v. Swan*, 40 Me., 260. He made no entry, took no new possession, under his deed, and has no greater right than his grantor would have acquired under the adverse possession commenced in 1857, if the grantor had continued in possession until the commencement of this action. 6. Were it true that Philip Zaun could hold over, as by sufferance, still, on his severing the relation by deed to another person also in possession, the reversioner might treat his grantee as a disseizor holding *mala fide*, and sue in ejectment. Angell, § 443. (Counsel also contended, upon the evidence, that the defendant was not a purchaser in good faith without knowledge of Rosina Ahnert's heirs, and for that reason could not claim the benefit of the ten-year limitation, citing *Park v. Kane, supra; Sterry v. Arden*, 1 Johns. Ch., 261, 9 Cow., 554; *Saxton v. Hunt*, 1 Spencer (N. J.), 487; *Fallass v. Pierce, supra; Phelan v. Boylan*, 25 Wis., 683). 7. If correct in the foregoing positions, we are entitled to recover an undivided one-half of all except the one-sixth inherited by John Gottlieb Ahnert from his son Henry prior to the deed of 1851. (1) The one-sixth inherited from his son August, in 1855, went, on Gottlieb's death, to his heirs; and the covenant of warranty in the deed of 1851, does not estop them from claiming the title; because, as we have already shown, that deed does not *undertake to convey* anything more than the

one-sixth inherited from Henry, and the grantor's life estate in the other five-sixths. 2 Washb. R. P., 480–81; *Mickles v. Townsend*, 18 N. Y., 577, and cases there cited; *Allen v. Holton*, 20 Pick., 458. (2) At the death of Franz, in 1860, he was under the disability of infancy, and would have had five (if not ten) years after his majority to bring this action. His interest descended to his surviving brothers and sisters; and plaintiff, being a married woman when that interest so descended, was entitled to the protection of the state. (3) On the death of Ernst, in 1873 (about thirty-seven years old), his title descended to his surviving brother and sister, the latter (the plaintiff herein) being still under the disability of coverture. If defendant could acquire a prescriptive right only by an adverse possession of twenty years, plaintiff is clearly entitled to all the interest she seeks to recover.

LYON, J.  I. It seems to be conceded (and the fact doubtless is), that, from the death of Johann Gottlieb Ahnert, in 1857, the possession by the defendant and his grantor of the land in controversy has been adverse to the claim of the plaintiff. The question discussed by the learned counsel is, whether the same was a possession under color of title, in favor of which the statute of limitations might run in ten years, or whether it comes under the limitation of twenty years applicable to cases in which the claim of title is not founded upon a written instrument purporting to ·be a conveyance of the land thus possessed. R. S., ch. 138, secs. 6–10 (Tay. Stats., 1622–3).

It was strongly argued on·behalf of the plaintiff, that the deed from the elder Ahnert to the grantor of the defendant does not purport to convey the whole of the tract of land, an undivided share of which is claimed by the plaintiff, but only the interest therein which the former took as tenant by the curtesy and as heir of his deceased son Henry. If this be a correct position, it necessarily follows therefrom that the de-

fendant cannot successfully assert an adverse possession of the land by color of title, a continuance of which for ten years may operate to bar the plaintiff's claim.

The deed under consideration is, in form, a conveyance of the whole tract therein described. It may well be doubted whether the words relating to the grantor, to wit: "Father of Henry Ahnert, deceased, and husband of Rosina Ahnert, deceased, and sole heir of both," are anything more than a mere *descriptio personæ*. If they amount to more than that, when the grantor described himself as *sole* heir of his wife, who died seized of the land, he thereby indicated an intention to convey the whole interest in such land, and, as we have seen, he used apt words to carry out his intention. We conclude that the deed of 1851 purports, on its face, to convey the whole tract.

From the foregoing views, two results follow. These are, 1. The possession of the defendant and his grantor was under color of title, and adverse to the plaintiff; and 2. By virtue of the covenants in the deed from the elder Ahnert, the interest in the land which he inherited as heir of his son August (who died in 1855), enured to the benefit of the defendant's grantor, by way of estoppel.

II. Ernst Ahnert was of full age when the adverse possession of the elder Zaun commenced in 1857, and his right of action to recover his portion of the land became barred by the statute of limitations in 1867. Hence, when he died in 1873, no such right of action descended to his heirs.

III. Franz Ahnert dying in 1860 under the age of twenty-one years, and never having been married, the undivided one-sixth of the whole tract, which he inherited from his mother, descended to his surviving brothers and sisters (Karl, Ernst and the plaintiff), in equal shares. R. S., ch. 92, sec. 1, subd. 7 (Tay. Stats., 1170, § 1, subd. 6).

In *Perkins v. Simonds*, 28 Wis., 90, we held, after much investigation, that in such a case the surviving brothers and

sisters inherit from the ancestor and not from the deceased child. As applied to the present case, the rule there settled is, that the plaintiff took one-third of the share of Franz in his mother's estate, in the same manner in which she would have taken it had Franz died before his mother. The amount of the interest which she so took is of course increased by the death of Henry and of August, after the death of their mother.

*Perkins v. Simonds* was ruled by the revised statutes of 1839, p. 185, § 39, which is substantially the same as the corresponding provision in the revision of 1858 last above cited. The statute of 1839 was borrowed from Massachusetts, and had received judicial construction in that state before its adoption here. We felt bound by, and therefore followed, the adjudications in that state construing the statute, as will be seen by an examination of the opinion. We must adhere to the rule thus established. We therefore hold that the portion of the lands of which Mrs. Ahnert died seized, which descended to Franz, and by his death to the plaintiff (being one-eighteenth of the whole), is held by the plaintiff in the same manner as she holds the one-sixth thereof which came to her directly from her mother, and is subject to the same rules of law. If she can recover either of these undivided interests or portions in this action, she can recover both; failing to recover one of them, she cannot recover either.

It should be stated in this connection that Mr. Justice COLE reserves his opinion on this point, but concurs in the other points herein decided.

IV. This brings us to the controlling question in the case: whether the plaintiff's cause of action is barred by the statute of limitations. Had she been unmarried in 1857, when the adverse possession of the defendant's grantor commenced, it is indisputable that her right would have been thus barred. But she was at that time, and ever since has been, a married woman. It is claimed for her that the statute has never com-

menced to run against her. This position is founded on the provisions of the R. S., ch. 138, sec. 13 (Tay. Stats., 1624, § 13). To this it is answered that the conditions of infancy, coverture, etc., mentioned in the statute, do not prevent the running of the statute any longer than while such conditions constitute *disabilities;* that the word "disability" is used in the statute in its technical, legal sense, meaning only "an incapacity of action under the law," or "an incapacity to do a legal act" (Burrill's Law Dic.); and hence, that the statute concerning the rights of married women (Laws of 1850, ch. 44; Tay. Stats., 1195), which gives to a wife the absolute control of her separate estate the same as though she were unmarried, and the provisions of another statute which permits her to sue alone in respect to such estate (R. S., ch. 122, sec. 15), removed the disability of coverture, and set the statute in motion against the plaintiff, more than ten years before she commenced her action. If these positions are well taken, the action cannot be maintained; and they are sustained by the adjudications of several most respectable courts, made under statutes quite similar to ours. *Brown v. Cousens*, 51 Me., 301; *Slater v. Cave*, 3 Ohio St., 80; *Ong v. Sumner*, 1 Cin. Superior Ct. R., 424; *Ball v. Bullard*, 52 Barb., 141. In the first of these cases, the principle upon which all of them were decided is tersely expressed, thus: "no disability, no exemption."

On the other hand, several other courts of equal respectability have held precisely the opposite doctrine. *Burke v. Beveridge*, 15 Minn., 205; *Bauman v. Grubbs*, 26 Ind., 419; *Dunham v. Sage*, 52 N. Y., 229.

The question has not been passed upon by this court, although it was raised and argued in *Ladd v. Hildebrant*, 27 Wis., 135. The conflicting decisions in other states have resulted in no decided weight of authority either way. We must therefore determine for ourselves the proper construction of the statute, in the light of the accepted rules of law applicable to the case.

It is apparent that the case turns upon the meaning of the word "disability," as used in the statute. The question is, whether it is there used in the restricted sense above mentioned, or has it a larger signification? Upon this question our views will be briefly stated.

1. It seems to us that the definition given by the learned counsel for the defendant, and apparently sanctioned by Burrill, is too narrow. The grounds of the disability of a wife are thus stated by Chancellor Kent: "The disability of the wife to contract so as to bind herself, arises not from want of discretion, but because she has entered into an indissoluble connection, by which she is placed under the power and protection of her husband, and because she has not the administration of property," etc. 2 Com. (11th ed.), 137. The law giving her the control of her separate estate removes only one of the grounds of disability. She is still under the control and protection of her husband. He can lawfully control her domicil and her employment. In these particulars she is now, as she was at the common law, under a degree of duress. Although she may have an action in her own name relating to her separate estate, and may administer the same as if unmarried, yet such *quasi* duress, which is a recognized element of legal disability, still remains.

2. But the section itself furnishes proof that the legislature did not use the term in the restricted sense claimed for it. One of the conditions mentioned in the section as preventing the running of the statute of limitations is that of persons "imprisoned on a criminal charge, or in execution upon conviction of a criminal offense, for a term less than for life." We suppose that persons in this condition may bring actions in their own names, notwithstanding their imprisonment. We find no statute to the contrary. We have a statute which provides for the service of process upon convicts in the state prison. R. S., ch. 188, sec. 23 (Tay. Stats., 1976, § 23). If they can be sued, manifestly their civil rights are not sus-

pended, and they may bring actions. Neither are we aware of any law which requires the appointment of a next friend or guardian for a convict plaintiff or defendant. In the absence of such a law, if the civil rights of the convict are not suspended, it necessarily follows that he may sue or be sued in his own name.

In New York there is a statute which suspends all of the civil rights of a person under sentence of imprisonment in the state prison for a term less than for life, during the term of his imprisonment. 3 R. S. (1859), Title 7, Part 4, ch. 1, § 29; *O'Brien v. Hagan*, 1 Duer, 664; *Miller v. Finkle*, 1 Parker's Cr. R., 374. In the revision of 1830, in which this provision stands as § 19, we find the following note by the revisors relating to that section: " New; taken substantially from Mr. Livingston's code, p. 29; declaratory of what is probably the law, although we have had no express decisions on the subject." 3 R. S. (1830), p. 835. It seems very clear that our statute, which provides for the service of process on convicts in the state prison, was enacted on the theory that, in the absence of any statute to the contrary, the civil rights of such convicts are not suspended during their imprisonment.

But however this may be, the exemption in sec. 13 of persons imprisoned on a criminal charge, or in execution upon conviction of a criminal offense, extends to persons so imprisoned as well before as after trial, and to persons so in execution who have only been sentenced to imprisonment in a county jail. As a matter of course, the civil rights of such persons cannot be affected or impaired by the criminal charge or conviction. They may still control their property, make valid contracts, and sue and be sued in their own names. Otherwise the civil rights of a person imprisoned on a charge of assault and battery, or any other misdemeanor, whether before trial or after conviction and sentence, would be suspended. This would be simply monstrous. Yet the statute treats a

person thus imprisoned as under disability. Manifestly, it does not mean the disability which results from the total or partial suspension of civil rights, but that which results from duress. We cannot doubt that the term has the same signification when applied to the condition of coverture, which, as we have seen, is also, to some extent, one of duress.

3. The history of legislation in this state on the subject-matter of the statute under consideration, shows that the legislature never supposed that the exemption of married women from the operation of the statute of limitations had been taken away, until it was done directly in actions for the recovery of real estate, by the enactment of ch. 44, Laws of 1872.

Perhaps but little importance should be given to the fact that sec. 13 (which is found in substance in the revised statutes of 1839 and also of 1849) was reënacted in the revision of 1858, without material alteration, although the acts which it is claimed exclude married women from the benefit of that section, were then in force and were reënacted in the same revision. This fact is not, however, without significance. It is worthy of consideration when we are required, as we are in the present case, to determine whether a statute has been repealed by implication.

But there is another fact much more significant. When the act of 1872 was passed, amending section 13 by striking therefrom the 4th subdivision, so that its provisions should no longer apply to the condition of coverture, the legislature left untouched sec. 29 of the same chapter, which relates to nearly all personal actions, and which, in its effect upon such actions and in form, is very similar to sec. 13. If the legislature of 1872 supposed that the amendment to section 13 had already been made by implication, it could only have enacted ch. 44 for the purpose of clearing that section of useless rubbish; and in such case it would certainly have made the same amendment to section 29, and for the same reason. The failure to do so is strong if not conclusive evidence that the legislature

were of the opinion that both sections were unaffected by former laws. Hence, for satisfactory reasons no doubt, it amended one section and left the other in its original form.

4. The tendency and obvious purpose of all laws affecting married women which have been enacted in this state during the last twenty-five years, have been, almost without exception, to extend the privileges and immunities of that class of persons without imposing upon them corresponding liabilities and burdens. Keeping this fact in view, and remembering the principle that repeal by implication is not favored, we are impelled to the conclusion that the legislature, when it removed some of the disabilities of coverture, did not intend thereby to deprive the wife of any privilege or right extended to her by other statutes.

5. It must be conceded that very many of the old rules of law regulating the marital relation have been abrogated or materially changed by modern legislation. Those rules were the results of the wisdom and experience of centuries, and were believed by our fathers to harmonize with the Divine law which founded and sanctified that relation. Whether those rules have been departed from wisely or unwisely, is not for us to determine. But we are profoundly conscious that such legislation is fraught with danger, and that any errors therein must necessarily lead to disastrous results, the magnitude of which cannot well be overestimated. We have neither the power nor the inclination to advance in that direction only as we are compelled to do so by the clearly expressed will of the legislature. We must not accelerate the process of innovation and change by forced construction of statutes on the subject. Hence, until the legislature expressly so enact, we cannot hold that a wife is no longer under legal disability.

We conclude that the judgment of the circuit court, by which the plaintiff recovered the undivided one-sixth of the tract of land described in the complaint, which she inherited directly from her mother, and the undivided one-eighteenth

thereof which she inherited from the same source on the death of her minor brother Franz in 1860, is correct and should be affirmed.

*By the Court.* — Judgment affirmed.

On a motion for a rehearing as to so much of the foregoing decision as relates to the one-eighteenth claimed by the plaintiff as derived through her brother Franz, *Mr. Winkler* argued that the decision rested on *Perkins v. Simonds*, 28 Wis., 90, and that in turn upon certain Massachusetts decisions; and that the conclusion reached is not sustained by *Perkins v. Simonds.* The doctrine of the latter case is merely this: that where one of several children, heirs of a common parent, dies under age and intestate, his brothers and sisters shall be entitled to his property inherited from such parent, in the same proportions as if they had taken it from the parent directly; and the law calls this, technically, taking as heirs of the parent as the ancestor, and not taking as heirs of a deceased brother or sister. That case turned on the meaning of the word "ancestor" in sec. 4, ch. 92, R. S. *Nash v. Cutler*, 16 Pick., 491 (which is chiefly quoted in *Perkins v. Simonds*), simply decides that the statute and doctrine in question do not apply where the children take *by will* from the father, but that in such case a mother inherits from a deceased minor child. *Sheffield v. Lovering*, 12 Mass., 490, merely states the effect of the statutes as to *who* take under it. *McAfee v. Gilmore*, 4 N. H., 391, holds that it does not apply where there is a will. *Crowell v. Clough*, 3 Foster, 207, and *Prescott v. Carr*, 9 id., 453, hold that under such a statute, upon the decease of one of the children unmarried and under age, brothers and sisters of the half blood do not participate in his share of the inheritance. This fully supports *Perkins v. Simonds.* But the doctrine of these cases, and the statute on which it is founded, are merely a rule of descent, designating who the heirs shall be upon the decease of a person; saying,

if you please, that *his* heirs shall not take, but the persons who would have taken if he had never been. *But the fact remains that he has been.* And if the statute requires this fact to be left out of view in determining *who shall be the heir*, it does not follow that it must also be left out of view in determining *the nature of the title* these heirs take as against third persons. When an heir takes from his ancestor, he takes the title just as the ancestor leaves it. But the subject of inheritance here, although derived from the ancestor, is not what the ancestor left, but what the *child* left. It is not, therefore, true that the surviving children take *in the same manner* as they would have taken if the deceased child had died before the ancestor. During the ownership of the child, the title may have been impaired, alienated or lost. It may have been mortgaged or sold through a guardian; sold for taxes; or lost by adverse possession, where his disability does not save it, as in *Woodbury v. Schackleford*, 19 Wis., 55. Indeed, where it is adversely possessed for ten years under color of title, *his disability* alone can save it. If sec. 13 of the limitation act did not include infants, it would be gone, though every other member of the family were a married woman or confined in the state prison. Is not this alone conclusive that his is the one disability which alone can interrupt the statute of limitations? 2. Suppose that Franz had been nine years old when his father died and defendant's possession became adverse, and had lived till he was twenty, then died leaving the plaintiff, his married sister, and his two brothers, both over twenty-six years of age: what would be the consequence under the doctrine of the opinion? Each would be held to have taken his share of Franz's portion from his mother, just as he took his own portion, and it would be governed by the same rules of law. The sister, therefore, having been under the disability of coverture when the title accrued, which disability still continues, can bring her action at any time during this coverture, and within five years after it shall cease; but the brothers, be-

ing more than five years removed from their own disability, are barred of their own original interest, and *therefore also of this.* Here, then, an estate is barred, against which the statutes of limitation have never run!   3. How can this rule be harmonized with the express provisions of sec. 13, ch. 138? It is conceded that the adverse possession commenced in 1857. The statute declares that if a person entitled to commence any action for the recovery of real property (as Franz clearly was), be, at the time such title shall *first* descend or accrue (it *first* descended and accrued to Franz), within the age of twenty-one years (as Franz was), the time during which such disability shall continue shall not be deemed, etc.; but such action may be commenced (no matter by whom) after the time limited, and within five years after the death of the person entitled (clearly Franz) who shall die under such disability; and that such action shall not be commenced after that period. This statute applies to the title descended to Franz, and to any one who may succeed to his title, whether *called* his heir, or, by a legal fiction his mother's heir.   4. The decision gives the plaintiff *one-third* of Franz's share.   The opinion says: "The amount of the interest which she so took is of course increased by the death of Henry and of August after the death of their mother." But the doctrine of *Perkins v. Simonds,* as quoted from *Nash v. Cutler,* in 28 Wis., 95, is, that the inherited portion of a person dying as Franz did, "shall go just in the same manner as if such child had died during the lifetime of the ancestor, or, in other words, to those who would have taken the same share if such child had not existed." If Franz had died before his mother, or had never existed, each of the other children would have taken one-fifth of the estate, one-thirtieth more than they did take; and these one-thirtieth shares of Henry and August, by their deaths, have vested in their father, and by his conveyance and covenants have become the property of the defendant.

A rehearing was granted, and the cause was reärgued at the August term, 1875.

*E. P. Smith*, for the respondent:

The subject matter of descent spoken of in subd. 7, sec. 1, ch. 92, R. S. 1858, is "*all the estate*" that came to the deceased child by inheritance from his deceased parent — not the remainder of the estate, or such as may be unalienated or undisposed of at the death of the child. The statute clearly recognizes a distinction between this case and that of a person dying intestate, leaving but one child and no issue of other children. In the latter case the inheritance would be absolute; but in the former case it would be conditional, depending on the child's marriage or his attaining his majority. In such a case the estate may be sold and the fee divested for debts of the ancestor (R. S., ch. 92, sec. 1), but not for those of the infant. On the father's death, the estate becomes as to his minor children a base or qualified fee, determinable as to each on his dying unmarried and a minor. If he survive that period, the condition is gone, and the estate becomes perfect. *Gilman v. Reddington*, 24 N. Y., 16. It is what may be called a fee simple contingent. *Hubbard v. Rawson*, 4 Gray, 246. If it or its possibility of ripening into an absolute fee could be conveyed or in any way alienated before the minor's marriage or majority, the determinable quality of the estate would follow the transfer, and on his death before marriage or majority, it would descend free from the alienation, as if the minor never had an existence or an inheritance. *Nemo potest plus juris in alium transferre quam ipse habet.* 4 Kent, 10. And even if the child's share could be alienated in any manner while he remained an infant and unmarried (which we deny), our rights would be the same, subject to that destruction. *Doe v. Martin*, 4 Term, 39. The result would not be the same to the surviving brothers and sisters in this case, if the property had descended directly from the deceased minor; for then it would have descended to him in

fee simple absolute, and so our title would have been barred by adverse possession, or at least our action must have been brought within five years after the death of the infant ancestor. In *Nash v. Cutler*, 16 Pick., 491, it was distinctly held that if the estate of the deceased infant had been received by inheritance (and not by devise), then by operation of the statute it would have descended from the father to the other children then living. The case holds that the whole purpose of the statute is the descent of the intestate father's estate to his children, and so, necessarily, that the heirs who ultimately get the fee simple absolute, derive it directly from the father. So in *Sheffield v. Lovering*, 12 Mass., 489, the court declares that the effect of the statute was " to place the estate in the same situation as if that child had died before the parent; * * * as if the parent had devised all his estate to such of his children as should arrive at full age or be married." In *McAfee v. Gilmore*, 4 N. H., 391, the doctrine is reasserted, and *Sheffield v. Lovering* approved. So in *Crowell v. Clough*, 3 Foster, 208, the court says that the statute "looks to the source from which the estate is derived, and for this purpose *regards the estate of the father as still in the course of distribution;*" and that "the surviving children do not take under the general rule of descent as heirs and next of kin to the deceased brother or sister, but they take, under the special provision of the statute, the share of the deceased brother or sister, *as part of the parent's estate.*" It follows that the survivors take the same title and in the same condition as if they had received it directly from the deceased parent. 2. Treating the estate of Franz Ahnert as a contingent estate, there could be during its continuance no adverse possession as against us; since our right of entry did not accrue until that estate terminated. *Jackson v. Harsen*, 7 Cow., 327. 3. The remark as to the increase of plaintiff's interest by the death of Henry and August, if error, doubtless crept into the opinion from the fact being overlooked that August and Henry were of full age

when they died; but it was in any event a harmless error, as the judgment below made no allowance for their interest.

*Fred. C. Winkler*, for appellant, contended that the cases followed in *Perkins v. Simonds* have never been understood as holding that where there are several children of the deceased intestate, the minor children do not take the fee simple, but merely an estate defeasable by their death in infancy unmarried. Guardians' sales made for the benefit of the infant ward under chaps. 93 and 96, R. S., have hitherto been universally supposed to convey titles in fee simple. If respondent's theory be correct, every such deed, where the property came from a parent by inheritance and there was more than one child, conveys but a contingent fee, which would determine on the death of the ward under age and unmarried. It would also follow from this view that the law in force at the time of the parent's death must control the descent upon the death of the child long after, although the law may at that time be wholly different, and may provide that the same heirs of the child shall take as in other cases. All that the statute, or the construction placed upon it in the cases cited, amounts to, is, that this inherited property is to go by a *different rule of descent* from property acquired by the child from other sources. The mere fact that the persons to whom it goes are the heirs of a deceased parent, may justify the construction, already somewhat artificial, that what they receive they take as heirs of the parent; but it certainly cannot be extended into the doctrine that they take a different estate, or, for the purposes of their own enjoyment, take with different rights from those which the heirs of the child would have if the statute did not exist. Our statutes of descent, like all statutes of that character, simply operate upon the property left, and as it is left, at the time of the death upon which they take effect. If there is any language in the Massachusetts cases which seems to go farther than this, it is purely *obiter*, and wholly unnecessary to support the decisions made in those cases. 2. Whatever theory

be adopted as to the statute of descents, the facts remain undisputed, that the adversely possessed title first *descended* and accrued to Franz; that he died under disability; and that the language of the statute therefore applies, that the action must be brought within five years. The statute was undoubtedly intended to apply, as it does in terms, to all cases where an heir dies under the disability. If, by an artificial construction, it shall be held not to apply to property descended from a parent to one of several children, it stands repealed as to a majority of cases occurring in actual life. 3. Upon the principle stated in the opinion filed in this case, Franz's one-sixth descended upon his death just as it would have done if he had never existed; therefore the two-thirtieths of Henry and August went, like their own original shares through their father, to the defendant; two other thirtieths went to the two surviving brothers; and only one-thirtieth to the plaintiff. The same result follows on the respondent's theory; each child became vested with a contingent reversion in Franz's share immediately upon the mother's death; the reversionary interests of Henry and August went to the father, and both became vested in defendant by the father's conveyance and covenants. The judgment below cannot be sustained on either of these theories; since either would give to the plaintiff only six-thirtieths or one-fifth of the land.

COLE, J. The counsel for the defendant criticises the language used in the former opinion, where it is said that the plaintiff took one-third of the share of Franz in the same manner she would have taken it if Franz had died before his mother. He insists that this statement of the rule of descent, if adhered to unqualifiedly, as laid down, will tend to shake all confidence in titles held under guardians' sales, and will startle the profession when authoritatively announced as the law of the state. For he argues that it is the logical result of the rule, where the heir takes from the ancestor, that

he takes the title just as the ancestor left it, while in the case under consideration the estate inherited is just what the minor child left at his death.

The language criticised by counsel is quite similar to that used by C. J. SHAW in *Nash v. Cutler*, while speaking of the purpose of a section of the statute of that state regulating the descent of intestate estate to children where one of them happens to die in infancy. And he said in that case that the provision intended that the infant's portion of the intestate's estate should go just in the same manner as if such child had died in the lifetime of the ancestor, or, in other words to those who would have taken the same share if such child had not existed   This language is sufficiently accurate when speaking of the general purpose of the statute. But while determining as to what estate was taken by the plaintiff on the death of Franz, it was not intended to affirm as an absolute rule that the other children would take the title on the death of the minor unaffected by any conditions, as though such minor had never in fact existed. That is to say, it is not decided that if the estate of Franz had been sold for his support and maintenance, or for his education, as it might have been under the statute, the purchaser would not have acquired a perfect title. The purchaser at the guardian's sale would take the title, and that title would not be divested on the infant's death, so as to go to the surviving children in the same manner as if such infant had died in the lifetime of the ancestor. So that it is quite true, as argued by counsel, while we regard the inheritance as coming from the ancestor in order to give it according to the statute to the other children, still we must and do consider whether there are any facts and circumstances affecting the share which descended to the infant, which take it out of the rule. The existing condition of the title is regarded; and when the property has been sold at a guardian's sale for the benefit of the infant, the provision regulating descent does not apply.

But it is further said that if the rule of descent stated in the opinion be correct, still the fact remains undisputed, that the adversely possessed title first descended and accrued to Franz; that he died under disability; and that therefore the action in respect to his share of the inheritance must be brought within five years, under sec. 13, ch. 138, R. S. Under the construction which we were compelled to place upon the statute of descent, we are unable to see how the statute of limitations can apply to the case. This may result in inconsistency and a want of harmony in the law. I have already stated ( *Wescott v. Miller*, unreported), that if the question were unembarrassed by the doctrine of the Massachusetts cases, I never could give the statute of descent the construction which has been placed upon it by the courts of that state. But, for reasons already given in other cases, we feel bound by the judicial interpretation which the statute had received before it was adopted here.

It results from these views that the decision of the circuit court must be affirmed.

*By the Court.* — Judgment affirmed.